UNITED STATES of America, Plaintiff,

v.

Carl PLEIER, Defendant.

No. A93–113 CR (JWS).

United States District Court,
D. Alaska.

April 25, 1994.

Crandon Randell, Asst. U.S. Atty., Anchorage, AK, for plaintiff.

Mary C. Geddes, Asst. Public Defender, Anchorage, AK, for defendant.

### ORDER FROM CHAMBERS

SEDWICK, District Judge.

### MOTIONS PENDING

N. Ray Kalyan and Carl Pleier are defendants in two unrelated criminal prosecutions: *United States v. N. Ray Kalyan,* Case No. A93–112 CR (JKS)[1] and *United States v. Carl Pleier,* Case No. A93–113 CR (JWS).[2] Each was indicted by the same grand jury. Messrs. Kalyan and Pleier are represented by the same attorney. Each has filed a motion pursuant to 28 U.S.C. § 1867(a) and (d) which challenges the Plan of the United States District Court for the District of Alaska for the Random Selection of Grand and Petit Jurors ("Plan"). The motions and related briefing are virtually identical.[3]

---

1. Mr. Kalyan is charged with one count of providing false statements in violation of 18 U.S.C. § 1014.

2. Mr. Pleier is charged in a three-count indictment with evasion of federal income tax in violation of 26 U.S.C. § 7201, giving a false statement in violation of 18 U.S.C. § 1001, and structuring a currency transaction in violation of 31 U.S.C. §§ 5322(a) and 5324(a).

3. The motion in *Kalyan* is at Docket No. 76; the motion in *Pleier* is at Docket No. 166. Mr. Kalyan's case has been reassigned to the judge presiding in Mr. Pleier's case for purposes of deciding the challenge to the Plan. The court finds it expedient to prepare a single text suitable, with the addition of the appropriate case heading, for filing in both cases.

Each defendant seeks dismissal of his indictment on the grounds that the venire from which the grand jury was selected pursuant to the Plan was not comprised of a fair cross-section of the community and, therefore, substantially failed to comply with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. ("the Act") and violated the Sixth Amendment to the Constitution. In a similar vein, each defendant argues that the venire from which his petit jury would be drawn would be constituted under the Plan in a manner which fails to comply with the Act and violates the Sixth Amendment. . Each defendant requests a stay of proceedings until a properly drawn petit jury panel can be assembled. An evidentiary hearing relating to these matters is requested.

Each defendant has renewed his motion to disqualify all judges of this district and, in addition, has requested disclosure of all communications between the assigned judge and any other judge and clerk or deputy clerk of the district.[4] Finally, each defendant has joined with the Alaska Native Justice Center to renew its motion to file an *amicus curiae* brief.[5]

No party has requested oral argument on any of the motions. The principal issues have been extensively briefed, and the court does not believe that oral argument would be of material assistance to its determination of the motions.

### THE PLAN

Passage of the Act in 1968 required the district courts of the United States to introduce a degree of uniformity in the methods used to select persons to serve on grand and petit juries.[6] Alaska, like other districts, soon adopted a plan for the random selection of jurors pursuant to the Act. In September 1968, the original Plan received final approval from the Ninth Circuit. The Plan took effect on December 22, 1968. There have been several amendments to the Plan since 1968. As presently in effect, the Plan consists of a restated version dated May 19, 1989, together with the 1993 amendments thereto.[7]

Certain features of the Plan have remained constant since 1968. Perhaps the most fundamental is that the universe of persons to be considered for jury service consists of actual voters. The Plan has never provided for selection from registered voter lists and has never called for supplementing the list of voters with names drawn from another source. A second basic feature of the Plan is its provision for selection of grand jurors on a district-wide basis and petit jurors from the particular "division" within which the court will sit. The Plan creates five divisions which are used in the petit jury selection process: Anchorage, Fairbanks, Juneau, Ketchikan, and Nome. These divisions correspond to the five places where Congress has directed the court to convene. 28 U.S.C. § 81A. A third fundamental attribute is the Plan's use of election districts in place of counties or parishes, political subdivisions which do not exist in Alaska. Finally, the Plan operates in a district which, like other districts, is home to several groups of people. The groups include one peculiar to Alaska, Alaska Natives.

---

**4.** Identical motions appear at Docket No. 119 in *Kalyan* and Docket No. 203 *Pleier*. The original motions to disqualify were denied at Docket No. 79 in *Kalyan* and Docket No. 170 in *Pleier*.

**5.** Docket No. 118 in *Kalyan* and Docket No. 204 in *Pleier*. The motions are identical except that counsel for the Alaska Native Justice Center did not sign the motion filed in *Pleier*, which the court finds to be an oversight in view of the fact that both case headings appear on the pleadings filed in each case. The original motions were denied at Docket No. 99 in *Kalyan* and Docket No. 188 in *Pleier*.

**6.** House Report No. 1076 adopting the earlier Senate report on S. 989, *reprinted in* 1968 U.S.Code Cong. & Admin.News 1792 *et seq.* (hereinafter cited as "House Report"), at 1793.

**7.** The final approvals, as well as the original Plan itself, are attached to the General Order filed September 23, 1968. "In the Matter of Adoption of a Jury Selection Plan Under Public Law 90–274," records of the United States District Court for the District of Alaska, file entitled "Jury Selection Plan." The current version of the Plan and all amendments are found in the same file. The file is maintained by the clerk of court, together with associated maps and memoranda in companion files (collectively "JSP Files"). The JSP Files are public records of the District Court for the District of Alaska to which the parties have access.

## DISCUSSION

### A.  The Fair Cross–Section Standard.

██ Both the Sixth Amendment and the Act require that the venire from which a jury is chosen be comprised of a fair cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). "The test for a constitutionally selected jury is the same, whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service Act." *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir.1985). When Congress adopted the "fair" cross-section standard, it was cognizant that the standard did not mandate a precisely accurate cross-section:

> The bill uses the term "fair cross section of the community" in order to permit minor deviations from a fully accurate cross section. The voting list need not perfectly mirror the percentage structure of the community. But any substantial percentage deviations must be corrected by the use of supplemental sources. Your committee would leave the definition of "substantial" to the process of judicial decision.[8]

### B.  The Duren Test.

In *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 666, 58 L.Ed.2d 579 (1979), the Supreme Court set out the criteria required to show a violation of the fair cross-section standard:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

### 1.  Distinctive Groups.

██ Here, defendant contends that Alaska Natives constitute a distinctive group. Plaintiff does not controvert this assertion. The court agrees.  *See United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009 (D.Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *Alaska Natives And The Land*, prepared by Federal Field Committee for Development Planning in Alaska (U.S.G.P.O.1968) at pp. 3–11.  *See also United States v. Brady*, 579 F.2d 1121, 1131 (9th Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979) (American Natives are a distinctive group).

Defendant also contends that persons between the ages of 18 and 30 years are a distinctive group.  Defendant cites no authority for this proposition and the case law compels a contrary conclusion.  The Ninth Circuit has made it abundantly clear that such "young adults" are not distinctive groups for purposes of the *Duren* test. *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir.1992) (dealing with college students, but specifically noting that young adults are not a distinctive group); *United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir.1977); *United States v. Potter*, 552 F.2d 901, 905 (9th Cir.1977).[9]

### 2.  Fair and Reasonable Relation to Numbers in Community.

#### a.  Community.

Under the Plan grand juries are drawn from a district-wide venire, but petit juries are drawn from a venire limited to certain state election districts and precincts surrounding the towns in which the court sits. Defendant, who would be tried by a petit jury in Anchorage, says, "The relevant community for determining the representativeness on federal juries is the entire federal district, not merely the Anchorage division, which was created by judicial—not legislative—fiat."[10]  This rather shrill accusation of

---

8.  House Report at 1794.

9.  Pursuing a claim so clearly at odds with established precedent suggests that defendant's counsel should consider the policy reflected in 28 U.S.C. § 1927.

10.  "Motion For Dismissal Of Indictment, For A Stay Of Proceedings And For Evidentiary Hearing", Docket No. 166 in *Pleier* and Docket No. 76 in *Kalyan* (hereinafter "defendant's motion") at p. 17.

action by fiat can be read to suggest two distinct concerns. First, it implies that it would never be appropriate to select juries from a venire drawn from less than an entire judicial district. Second, if in some districts the venire need not be chosen from a district-wide source, the absence of divisions created by legislation for the District of Alaska compels a contrary conclusion.

■ With respect to the first point, defendant cites no authority for the proposition that the venire must come from the entire district. This is not surprising, for the case law is to the contrary. *E.g., United States v. Herbert,* 698 F.2d 981, 984 (9th Cir.1983), *cert. denied,* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983). With respect to the second point, defendant says that Alaska is a single district with no legislatively created "divisions." While that much is correct, it must be added that the same statute which creates a single district mandates that, "Court shall be held at Anchorage, Fairbanks, Juneau, Ketchikan and Nome." 28 U.S.C. § 81A. The Act provides in pertinent part that juries are to be selected from a "fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Section 1869(e) specifically defines the operative term "division" to include, "in judicial districts where there are no statutory divisions, such counties, parishes, or similar political subdivisions surrounding the places where the court is held as the district court plan shall determine...." Defendant cites no authority to support his view which is demonstrably contrary to the language of the pertinent statutes.

■ Defendant next complains that in defining the geographical area from which Anchorage jurors are drawn, the Plan uses electoral divisions rather than "counties, parishes, or similar political subdivisions" as required by 28 U.S.C. § 1869(e). Assessment of this complaint must begin with the observation that there are no counties or parishes in Alaska.[11] To understand the reasons why the use of electoral divisions is an appropriate substitute for counties or parishes requires some background about both local government and the administration of justice in Alaska. To begin, it needs to be noted, although defendant does not mention the fact, that there are units of local government in Alaska which are in many respects comparable to counties or parishes. State law provides for the incorporation of both cities and boroughs.[12]

Using cities or boroughs as substitutes for counties or parishes for purposes of 28 U.S.C. § 1869(e) would frustrate the Act's objective of assuring that each citizen has an opportunity to be considered for jury service. The use of cities for purposes of summoning juries is obviously unsatisfactory, for they are small and leave out most of the state's land area and much of its population. If the entire state were divided into boroughs, Alaska would have a local government analog to counties or parishes. However, there are many areas of Alaska which lie outside any of the organized boroughs.[13] Thus, a system based on the existing system of local government in Alaska would fail to give all Alaskans an opportunity to be considered for service on a federal jury as contemplated by 28 U.S.C. § 1861.

Defendant asserts that election districts in Alaska cannot be "similar political subdivisions" to counties and parishes within the meaning of § 1869(e) by pointing to the definition of "political subdivision" in the Voting Rights Act of 1965. The authority relied upon is inapposite, and defendant overlooks the obvious functional purpose of counties and parishes in the context of § 1869(e). This purpose is apparent from considering the proviso in § 1869(e) which mandates inclusion of *all* counties or parishes in one of

---

**11.** Plan at p. 2, unnumbered footnote.

**12.** AS 29.05.011 (cities); AS 29.05.031 (boroughs). Under certain circumstances, either a city or a borough can adopt a home rule charter, and may thereafter be called a municipality. AS 29.10.010. Anchorage, the district's most populous metropolitan area, is organized as a home rule municipality pursuant to AS 29.10.010. It is the result of combining the City of Anchorage and the Greater Anchorage Area Borough and retaining the borough's boundaries. Anchorage Municipal Charter, § 1.02.

**13.** The court takes judicial notice of the fact that there are large tracts of inhabited (albeit sparsely) land scattered throughout Alaska which fall outside organized boroughs and cities. *See* AS 29.03.010 which relegates all of these areas to a single "unorganized" borough.

the divisions in every state. Read against a convention of local government organization appertaining in almost all of the United States which calls for division of the entire state into either counties or parishes, it is evident that the Act uses counties or parishes as units, because that approach will assure all citizens a chance to be considered for federal jury service. Here in Alaska, use of electoral divisions achieves the very same objective, for the entire state is divided into election districts and the districts are further subdivided into precincts.[14]

Substantive differences between counties and election districts—the former being a unit of local government, the latter merely a subdivision of the citizenry convenient for conducting elections—are irrelevant to § 1869(e). For purposes of the Act, election districts are similar to counties or parishes because they are political divisions into which the entire state is divided. To be sure, they are an inconvenient substitute, because periodic reapportionments will require periodic adjustments in any jury selection plan which uses them. However, despite this inconvenience, it is clear that electoral districts are political subdivisions which are the functional equivalent of, and therefor similar to, counties and parishes for purposes of § 1869(e).

It is appropriate to point out that the use of election districts in Alaska for purposes of organizing the delivery of trial court level judicial services is not unique to the federal courts. The State of Alaska is divided into four judicial divisions which taken together embrace the entire state. From the time of statehood, these divisions have always been defined in terms of election districts.[15]

Finally, defendant complains that in 1993 the Plan was amended and that the amend-

ments in some instances have the effect of assigning some precincts within the same election district to different Plan divisions. Defendant describes the use of the precincts as "judicial gerrymandering."[16] However, an examination of the Plan and the maps in the JSP Files discloses nothing so sinister. Rather, as defendant concedes, the amendments did no more than maintain essentially the same geographical boundaries for the Plan's divisions.[17]

#### b. Numbers.

■ Defendant has no right to demand that the particular grand jury which indicted him, or any particular petit jury, must reflect a fair cross-section of the community. Rather, it is defendant's right to insist that the jury be drawn from a venire that is a fair cross-section. *United States v. Miller,* 771 F.2d 1219, 1228 (9th Cir.1985). As has been said:

> The act guarantees only that the jury shall be "selected at random from a fair cross section of the community." It does not require that at any stage beyond the *initial source list* the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis. (Emphasis added.)[18]

Defendant has presented evidence which shows that in Alaska, of the population old enough to serve on a federal jury, 14.5 percent are Alaska Natives.[19] To ascertain whether Alaska Natives are underrepresented in the district-wide list of voters, which is the initial source list under the Plan for grand juries, one would wish to compare 14.5 percent to the percentage of persons who are Alaska Natives on the Plan's initial source list. Defendant has calculated the second

---

**14.** *See, e.g.,* State of Alaska Election District Map, June 25, 1992, and amendment to Plan dated July 8, 1993, in JSP files.

**15.** AS 22.10.010; § 16 ch 50 SLA 1959; § 1 ch 18 SLA 1974.

**16.** Defendant's motion at p. 20.

**17.** Defendant acknowledges this point at p. 20 of defendant's motion, but complains that maintaining continuity divorces the Plan's five divisions from their "statutory license for existence under [the Act]." As has been explained, the Plan is authorized by § 1869(e) to determine divisions

and does not depend upon the existence of divisions created by statute. 28 U.S.C. § 1869(e).

**18.** House Report at p. 1794.

**19.** Exhibit A to defendant's motion gives 14.5 percent for 1993, the year in which defendant was indicted and 14.6 percent for 1994. In the text of defendant's motion, it is twice said that Alaska Natives make up only 14 percent of the population. Defendant's motion at pp. 14 and 33. The court will use the 14.5 percent figure.

percentage to be 9.6 percent using a sampling method which defendant describes as statistically reliable [20] and which, for present purposes, the court accepts.[21] The difference between the percentage of Alaska Natives in the general population and the calculated percentage for the initial source list is 4.9 percent (14.5 percent less 9.6 percent).

Defendant has urged the court to consider his petit jury challenge on the basis that the petit jury for a trial in Anchorage should be drawn from a district-wide source. As explained above, the correct source for petit jurors for an Anchorage trial is the Anchorage division. The number of jury age residents of the Anchorage division estimated by defendant to be Alaska Natives represents 10.3 percent of the total population.[22] To determine whether the initial source list for Anchorage petit jurors is a fair cross-section of the division's population with regard to Alaska Natives, one would wish to know the ethnic composition of the initial source list.

In attempting to estimate the ethnic composition of the initial source list, defendant surveyed all petit jury panels summoned for trials in Anchorage. for 1992 and 1993 and initially looked at the ethnic characteristics of all those "who appeared and were assembled—and were not excused—for jury service...." [23] This methodology suggested that the composition of Anchorage division petit jury panels in 1992 and 1993 was, on the average, 4.3 percent Alaska Native from which it might reasonably be concluded that the initial source list was 4.3 percent Alaska Native. As with defendant's approach to estimating the composition of the initial source list for grand jurors, this methodology ignores the ethnicity of both those who failed to appear and those who appeared but were excused. Given Alaska Natives' seasonal participation in subsistence hunting and fishing [24] and given that many Anchorage division Alaska Natives reside outside metropolitan Anchorage in locations inaccessible by road or railroad, but still within the Anchorage division which stretches for hundreds of miles across southcentral Alaska and includes many predominantly Alaska Native communities; [25] this methodology almost cer-

20. Defendant's motion at p. 34.

21. Defendant used data from three grand jury panels. Given the overall number of grand juries summoned in this district, the court accepts defendant's assertion that this is an adequate sample size. In addition to sample size, there is a second potential problem with defendant's data. Defendant did not ascertain the ethnic characteristics of those persons who either failed to appear or were excused from two of the three grand juries. Given the facts, which the court judicially notices, that a higher percentage of Alaska Natives than of non-Native Alaskans lives in rural communities not reachable by either road or rail, and that a higher percentage of Alaska Natives than of non-Native Alaskans engages in seasonal subsistence harvests of fish and game to support their families, there is no reason to believe the persons absent or excused would have been less likely to be Alaska Natives than the persons who actually attended and served on the grand juries. Thus, the court will accept the proposition that defendant's imperfect methodology does provide an estimate of the percentage of Alaska Natives in the initial source list for grand juries which does not overestimate the percentage of Alaska Natives on the initial source list (although it may underestimate the percentage).

22. Exhibit E to defendant's motion.

23. Defendant's motion at pp. 12–13. The total number of panels surveyed was 63 as shown in Table 1 at pp. 14–15 of defendant's motion.

24. The significance of the subsistence harvest of fish and game to Alaska Natives is recognized in federal law. Title VIII, Pub.L. 96–487, Dec. 2, 1980, 94 Stat 2422 *et seq.*; Senate Report No. 96–413 concerning Pub.L. 96–487, *reprinted in* 1980 U.S.Code, Cong. & Admin.News 5070 at 5211–12.

25. Congress recognized more than 220 predominately Alaska Native settlements when it enacted the Alaska Native Claims Settlement Act, Pub.L. 92–203. *See* 43 U.S.C. § 1610(b)(1). Of these many are located in the Anchorage division. Anchorage division villages which are inaccessible by road or railroad include Akhiok, Akutan, Aleknagik, Chignik, Dillingham, Egegik, Igiugig, Iliamna, Kaguyak, Karluk, Kokhanok, Larsen Bay, Levelock, Manokotak, Naknek, Newhalen, Nondalton, Pedro Bay, Pilot Point, Port Graham, Port Heiden, Port Lions, Sand Point, Seldovia, Togiak, and Ugashik, among others. The court has taken judicial notice of the preceding facts. Defendant responded to the court's proposal to notice these facts by asking the court to notice the existence of other native villages in the division and the fact that all villages can be reached by air charter. The court recognizes these additional facts. Defendant asked the court to recognize additional demographic data which plaintiff opposed. *See* Docket Nos. 116 and 126 at p. 10 in *Kalyan* and Dockets Nos. 206 and 209 at p. 10 in *Pleier.* Suffice it to say that if the court were to recognize the additional demographic data, when taken in the context of all the data defen-

tainly underestimates the percentage of Alaska Natives on the initial source list.[26]

Accordingly, the court asked defendant to recompute the percentage taking into account the ethnicity of those absent or excused from jury panels during 1992 and 1993.[27] Defendant has done so and has submitted evidence that Alaska Natives made up 7.1 percent of the initial source list for Anchorage division petit jury panels in 1992 and 1993.[28] The difference between the percentage of Alaska Natives in the population of the Anchorage division and the indicated percentage of Alaska Natives on the initial source list is 3.2 percent (10.3 percent less 7.1 percent).

### c. Fair and Reasonable Relation.

■ *Duren* requires that defendant show that the number of Alaska Natives in the relevant initial source list does not bear a "fair and reasonable relation" to the number of Alaska Natives in the relevant community. *See Duren*, 439 U.S. at 364, 99 S.Ct. at 668. Defendant argues that measured by tests he identifies as "absolute disparity," "comparative disparity," "absolute impact," and "statistical significance" the racial composition of the initial source list does not bear a fair and reasonable relation to the community itself. The first two tests have been discussed in several judicial opinions and will be addressed below. Defendant describes absolute impact as identical to absolute disparity, except that it speaks in terms of numbers of people instead of percentages of groups of people. Accordingly, any discussion of abso-

lute disparity is adequate to address absolute impact. Defendant uses statistical significance as a measure of the probability that an observed disparity occurs by chance.[29] Defendant applies the statistical significance test to show that there is a very high probability that the grand juries he studied, and the 1992 and 1993 Anchorage division petit jury panels taken together as a whole, could not have been drawn at random from the general population. However, this line of argument is immaterial, for (assuming the utility of the test) the relevant inquiry is not about the probability that particular groups are drawn at random from the general population, but, rather, how likely is it that they have been drawn at random from an initial source list whose composition is a fair but not necessarily "fully accurate"[30] cross-section of the general population. Defendant has simply not addressed the pertinent issue in the context of his statistical significance test and so the court cannot consider that approach.

The absolute disparity method has been defined by the Ninth Circuit as follows: "We determine absolute disparity by taking the percentage of the group at issue in the total population and subtracting from it the percentage of that group that is represented on the [relevant assemblage]." *United States v. Sanchez–Lopez*, 879 F.2d 541, 547 (9th Cir. 1989). Comparative disparity was also defined in *Sanchez–Lopez:* "Comparative disparity is determined by taking the absolute disparity percentage and dividing that number by the percentage of the group in the

dant has presented, the additional data would support the concern about underestimation set out in the text.

**26.** Not taking into account the failure to appear based upon seasonal participation in subsistence harvests and lack of transportation—bad weather can easily preclude air transport from remote villages—might explain the inter-panel disparity in the percentage of Alaska Natives who appeared and served on Anchorage division petit jury panels in 1992 and 1993 shown in Table 1 of defendant's motion at pp. 14–15 (actually unnumbered, so page numbers were determined by reference to the preceding and succeeding pages). The Table indicates that the disparity ranges from zero percent to 10.8 percent.

**27.** The Plan permits the judge or clerk to excuse persons for whom service at any particular time would impose an undue hardship, such as would

be the case during an important subsistence harvest season. Plan at p. 13. Of course, such persons would be available for service at a later time, but seasonal unavailability could certainly skew the data for particular periods of time. It might also explain the disparity observed in Anchorage petit jury panels by defendant, who found a range of from zero percent to 10.8 percent Alaska Natives. *See* preceding footnote.

**28.** Exhibit DD to Response To Court's Order of April 6, 1994, Docket No. 127 in *Kalyan* and Docket No. 210 in *Pleier.*

**29.** Defendant's motion at p. 17.

**30.** House Report at 1794.

total population." *Id.* at 548. In this circuit the absolute disparity method is preferred and the comparative disparity method is not used. As said in *Sanchez–Lopez:*

> In determining the underrepresentation of a particular group in jury venires, we have consistently favored an absolute disparity analysis and have rejected a comparative disparity analysis. *United States v. Suttiswad,* 696 F.2d 645, 648–49 (9th Cir. 1982); *United States v. Armstrong,* 621 F.2d 951, 955–56 (9th Cir.1980); *United States v. Kleifgen,* 557 F.2d 1293, 1296–97 (9th Cir.1977); *United States v. Potter,* 552 F.2d 901, 905–06 (9th Cir.1977).

*Id.* at 547.

Here, with respect to representation on grand juries, the defendant has calculated an absolute disparity of 4.9 percent. The absolute disparity for petit juries in the Anchorage division is 3.2 percent.[31] The relevant inquiry therefore is whether a 3.2 percent or a 4.9 percent absolute disparity establishes a violation of the Act or the Constitution. While it is probably unwise to establish a specific mathematical threshold applicable in every case, existing jurisprudence does suggest that an absolute disparity of 3.2 percent or even 4.9 percent is well below the level ordinarily needed to make out a prima facie case. Thus, the Eleventh Circuit has said, "Although precise mathematical standards are not possible, this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity ... does not exceed ten percent." *United States v. Rodriguez,* 776 F.2d 1509 (11th Cir.1985). In *United States v. Suttiswad,* 696 F.2d 645 (9th Cir.1982), the Ninth Circuit found no substantial violation where there were absolute disparities of 7.7 percent for Hispanics, 4.7 percent for Asians, and 2.8 percent for African–Americans. One district court recently observed, "The Ninth Circuit has consistently held that absolute disparities below 7.7 percent are insubstantial and constitutionally permissible." *United States v. Irurita–Ramirez,* 838 F.Supp. 1385, 1389 (C.D.Cal.1993).

In this court's view the absolute disparity test cannot reasonably be applied without some regard for the representation of the particular distinctive group in the total population. For example, an absolute disparity of 7.7 percent would be far more troubling when dealing with a distinctive group whose representation in the general population was 8 percent than it would be if the group made up 15 percent of the total population. Thus, while mindful of the Ninth Circuit's teaching on the need to avoid the "exaggeration"[32] introduced when comparative disparity is used rather than absolute disparity, in this court's view comparative disparity can be used as an adjunct to absolute disparity as a means for assuring that the absolute disparity test is not applied in a vacuum.

Here, we are dealing with absolute disparities of 4.9 percent on the grand jury initial source list in a population where the distinctive group represents 14.5 percent and of 3.2 percent on the Anchorage division petit jury initial source list where Alaska Natives are 10.3 percent of the relevant population. Expressed in comparative disparity terms, this would mean an underrepresentation on grand juries of 33.8 percent (4.9/14.5) and an underrepresentation on Anchorage division petit juries of 31.1 percent (3.2/10.3). In *Sanchez–Lopez* the Ninth Circuit approved an absolute disparity concerning Hispanics which corresponded to a comparative disparity of 52.9 percent. 879 F.2d at 548. In *Suttiswad* the court provided a table from which comparative disparities for distinctive groups identified as Blacks, Spanish, and Asians may be calculated as follows: Blacks—30.1 percent; Spanish—64.7 percent; Asians—56.6 percent. 696 F.2d at 648. This court concludes that under the circumstances presented in the case at bar where the comparative disparities shown are less than 34 percent, absolute disparities of 4.9 percent on grand juries and 3.2 percent on petit juries are insubstantial and violate neither the Sixth Amendment nor the Act.

**31.** Defendant suggests the absolute disparity is 7.5 percent, but that is because defendant compares the indicated 7.1 percentage of Alaska Natives to the 1994 district-wide percentage of 14.6, rather than to the division percentage of 10.3.

**32.** *Suttiswad,* at 696 F.2d 649; *Kleifgen,* at 557 F.2d 1297.

### 3. *No Prima Facie Case Under Duren*

The third *Duren* factor—systematic exclusion—need not be addressed because, as explained in the preceding section, defendant has failed to establish the second of the three required elements of a prima facie case. Nevertheless, because defendant has offered argument respecting the proposition that the Plan systematically excludes Alaska Natives, the court will address the alleged exclusion in section C. below.

### C. *Alleged Exclusion of Alaska Natives.*

#### 1. *Use of Actual Voter Lists.*

■ The initial source lists used for both grand and petit juries in the district are lists of persons who actually voted. The pertinent Plan provision reads as follows:

> *Jury Selection Sources.* The list of actual voters for the last general election represents a fair cross-section of the community in the District of Alaska. Accordingly, names of grand and petit jurors serving on or after the effective date of this plan shall be selected at random from the lists of actual voters of all the state election districts within the relevant divisions.[33]

The Act specifically authorizes use of either actual voter lists or registered voter lists. 28 U.S.C. § 1863(b)(2). Only where it is "necessary to foster the policy and protect the rights secured by sections 1861 and 1862" must a district's jury plan prescribe the use of additional sources of names. *Id.* Thus, unless it is necessary to the selection of grand and petit juries from a "fair cross section of the community in the district or division wherein the court convenes," 28 U.S.C. § 1861, or necessary to prevent exclusion from jury service "on account of race, color, religion, sex, national origin, or eco-

nomic status," 28 U.S.C. § 1862, the Plan may quite properly make use of actual voter lists.

Defendant challenges the use of actual voter lists by asserting, among other things, that it is preferable to use lists of registered voters. Of course, the list of those who register is a longer list than that of those who actually vote. Defendant says that courts in two other circuits have said that the list of registered voters is preferred, citing *United States v. Test,* 550 F.2d 577, 584 (10th Cir.1976); *Foster v. Sparks,* 506 F.2d 805, 816 (5th Cir.1975). Use of registered voters was also described as preferable in pertinent legislative history.[34] However, the use of actual voter lists is neither prohibited by the Act nor the source of any demonstrated substantial deviation from the fair cross-section requirement under the *Duren* test. Moreover, the Ninth Circuit has itself approved the Plan's use of actual voter lists.[35] The court concludes that the use of actual voter lists is permissible and does not result in a jury selection plan which substantially departs from the objectives set out in 28 U.S.C. § 1861.

■ Defendant also complains that the Plan should supplement the voter lists with other sources of names. Several are suggested, including the list of persons who receive Alaska Permanent Fund dividends. This is a very comprehensive list of Alaskan residents[36], and it has been used by the State of Alaska in the state's system for jury selection.[37] It is certainly correct to say that supplemental sources can be used. Moreover, the Act provides that where it is "necessary" to achieve its objectives a jury selection plan "shall" make use of supplements. Here, as explained above, defendant has not established a departure from the fair cross-

---

33. Plan at p. 3.

34. House Report at p. 1799.

35. There may or may not be a good reason for using actual voter lists, but, in view of the fact that the choice of actual voter lists has not introduced a substantial departure from the fair cross-section requirement of the Act, this question is better addressed in the context of the ongoing administration of the Plan and possible changes to it.

36. At least 25 percent of the revenue received by the State of Alaska from the production of miner-

als in Alaska is placed in the Alaska Permanent Fund. Constitution of the State of Alaska, Art. IX, § 15. Each year a portion of the Fund's earnings is distributed to each Alaskan resident who has applied for a distribution. AS 43.23.005 *et seq.* The amounts vary from year to year, but the court takes judicial notice of the fact that recent distributions have been in excess of $900. Thus, there is a considerable incentive to seek a place on the Permanent Fund list each year.

37. Exhibit J to defendant's motion.

section standard, so it is not necessary to use supplementary lists for the Plan to be adequate to its task under the Act and the Sixth Amendment.[38]

### 2. Restriction to Presidential Elections.

■ The Plan is updated only once every four years. Moreover, the Plan is designed to use only lists of persons who voted in the general election at which the voter is afforded an opportunity to vote for President of the United States. Defendant argues that this design overlooks those who voted in off-year elections falling each two years between the quadrennial voting for President. Defendant points out that at times issues of significant local interest arise in off-year elections. Defendant offers no evidence, however, to establish that the turnout is actually higher in off-year elections.[39] The Act requires the Plan to be updated at intervals "not to exceed four years." 28 U.S.C. § 1863(b)(4). Given the Plan's compliance with 28 U.S.C. § 1863(b)(4) and defendant's failure to demonstrate any violation of the fair cross-section standard resulting from the use of the four year interval, this argument must be dismissed.

### 3. Failure to Empty Qualified Wheels.

■ The Plan requires the clerk of court to maintain a master jury wheel for grand juries and five master jury wheels for the five trial divisions. In addition, the clerk is directed to ·maintain corresponding "qualified" wheels comprised of the names of persons who have returned jury questionnaires which show they are not disqualified or exempt. As mandated in 28 U.S.C. § 1863(b)(4), the Plan requires that the master wheels be emptied and refilled each four years. However, the Plan does not require that the smaller qualified wheels be emptied each four years. The evident reason for this is to provide a continuous supply of qualified

jurors even during the inevitable delay between the refilling of the master wheels and the time that the clerk starts getting questionnaires back from which it may be determined who is disqualified or exempt from service.

Defendant argues that failure to empty the qualified jury wheels every four years is a substantial violation of the Act. It is true that because the names remaining in the qualified wheels at the end of a four-year cycle may identify persons who did not vote again and who would therefore not appear in the new master jury wheels, some persons not in the new master wheels could be called to serve. However, it is obvious that this expands, rather than restricts, the opportunity to serve on a jury, has no discernible deleterious effect on the opportunity of members of any particular distinctive group to serve, and represents no more than a permissible "play" in the administration of a jury selection system necessary to the system's operation. See Hamling v. United States, 418 U.S. 87, 137–38, 94 S.Ct. 2887, 2917–18, 41 L.Ed.2d 590 (1974).

### 4. Lack of Criminal Trials in Nome and Ketchikan.

■ Defendant attacks the Plan on the grounds that it does not provide an opportunity for residents of the Juneau, Ketchikan, and Nome divisions, including the Alaska Native residents thereof, to serve on criminal juries because these three divisions are so seldom the*situs of criminal trials. Several points need to be made.

First, it is appropriate to observe that with respect to grand juries, jurors are drawn from a district-wide list of voters. Second, the paucity of criminal trials in Juneau, Ketchikan, and Nome surely reflects the fact that the vast majority of Alaskans reside in the Anchorage and Fairbanks divisions.[40]

---

**38.** This is not to say the existing Plan could not be improved. It is one thing to find that the Plan passes muster. It would be better to find that the Plan is an exemplary one. It appears that use of the Permanent Fund dividend list (edited to exclude minors and·those temporarily residing outside the district) to supplement the voter list would be an improvement worth making.

**39.** Defendant argues that there was a large Alaska Native turnout in the 1982 election because

the ballot included a subsistence harvest issue, but cites no evidence to support the proposition that there was a larger Alaska Native turnout in that year than in the preceding or succeeding Presidential election years.

**40.** According to defendant's data, 85.4 percent of white Alaskans live in the Anchorage or Fairbanks divisions while 65.5 percent of Alaska Natives do so. Exhibit D to defendant's motion.

Third, for reasons of its own (which may be principally related to the distribution of Alaska's population), the executive branch of the federal government rarely files criminal complaints outside Anchorage and Fairbanks.[41] Fourth, while the executive branch of the federal government rarely prosecutes cases in Juneau, Ketchikan or Nome, civil actions are filed in those divisions, thus affording division residents the opportunity to serve on civil juries.[42]

Defendant points to four criminal cases filed by the United States attorney in 1992 or 1993 in Anchorage or Fairbanks and in which one of the other judges of this district thereafter denied a motion to change the place of trial to one or another of the three divisions in question. In relying here on those four cases, defendant effectively asks this court to hold that the other judges erred and that their errors are evidence that the Plan violates the Act or the Sixth Amendment. This court must decline the invitation to assume the power of collateral review. Suffice it to say for present purposes that four individual decisions by other district judges on contested motions in other cases do not constitute evidence that the Plan violates the Act.[43]

It may be true that residents of the Juneau, Ketchikan, and Nome divisions are likely to be limited to service on grand juries and civil petit juries, but this does not reflect a violation of the Act or the Sixth Amend-

ment. It reflects the minimal level of federal law crimes being committed and prosecuted in those communities.[44]

### D. *Evidentiary Hearing.*

Defendant requests a hearing to present evidence on seven topics.[45] First, defendant desires to put on testimony to show that "Other source lists are available to supplement Alaska actual voter records." A hearing is not required; the court can and does judicially notice the fact that such lists exist and would include people whose names do not appear on the lists of actual voters.

Second, defendant wishes to put on evidence to show "The court's utilization of actual voter records operates to exclude eligible individuals from jury wheels." Defendant offers to present a hodgepodge of data such as testimony that election districts are not similar to counties, that there are statewide voting patterns, that at the national level minority groups may be less likely to vote, historical background information on Alaska Natives, etc. However, none of this information is needed because the court takes judicial notice of the fact that there are such individuals.

Third, defendant says, "The court should hear testimony on the issue of whether young adults, ages 18–30 ("Generation X") are a distinctive group." This would be

---

**41.** The district's records show that for the years 1992 and 1993 a total of 308 criminal actions were filed in Anchorage, 214 were filed in Fairbanks, 1 was filed in Juneau, none were filed in Ketchikan, and none were filed in Nome.

**42.** During 1992 and 1993 civil case filings in the five divisions were as follows: Anchorage—1,471; Fairbanks—101; Juneau—40; Ketchikan—20; and Nome—7.

**43.** Defendant cites *United States v. Waters,* F93–100 CR; *United States v. Iyahuk,* A92–033 CR; *United States v. Contreras-Ceballos,* A91–107 CR; and *United States v. Sakurai,* A88–026 CR. It must be noted that the defendants did not all support motions to change venue from the metropolitan location. In *United States v. Waters,* there were two defendants who were brothers. One sought to move the trial to Nome; the other was satisfied to have trial in Fairbanks. Defendant's Ex. K at Docket No. 130 in *Kalyan* and at Docket No. 213 in *Pleier.*

To these cases, defendant has recently added *United States v. Brown,* A93–014 CR as further

evidence. Defendant's Ex. L, Docket No. 139 in *Kalyan* and Docket No. 212 in *Pleier.* Defendant's reliance on *United States v. Brown* is execrable. Though defendant correctly cites an order denying a motion to hold trial in Juneau, denial was specifically premised upon a finding that determination of the trial location was premature and without prejudice to renew the motion. In fact, trial was held in Juneau. *See* Case No. A93–014 CR at Docket No. 40.

**44.** It may be noted that the federal judicial system is still a system of limited jurisdiction. The business of prosecuting most criminal activity has historically been and remains the function of the states. Persons who live in Juneau, Ketchikan, Nome, and elsewhere in Alaska do have the opportunity to serve on state criminal juries.

**45.** Each of the topics is identified in quotations in the text which follows. All quotations are taken from Defendant's Corrected Consolidated Response to Opposition And To Court's Order, Docket No. 101 in *Kalyan* and Docket No. 190 in *Pleier,* at pp. 14–17.

pointless, because young adults are not a distinctive group. *E.g., Kleifgen,* 557 F.2d at 1296.

Fourth, defendant says, "The court should hear testimony on why absolute disparity is not the appropriate measure of underrepresentativeness." Had defendant offered an alternative to "absolute disparity" other than "comparative disparity" with which he actually addressed the relevant issue [46] a hearing might have been appropriate. Where, as here, the issue is limited to choosing between "absolute disparity" and "comparative disparity," the choice is dictated by Ninth Circuit precedent. *Sanchez–Lopez,* 879 F.2d at 547.

Fifth, defendant says he "will request the court take judicial notice of prior District of Alaska cases involving minority defendants seeking trial in the division where the offense occurred." The court has recognized the cases to which defendant refers. *See* particularly footnote 43 above.

Sixth, defendant expresses his intent "to subpoena court personnel and introduce court records establishing the lack of operation of the judicial divisions with respect to criminal jury trials." This is not necessary. The court judicially notices the paucity of criminal filings in Nome, Ketchikan, and Juneau. However, as explained in section C.4. above, this is a function of population distribution and decisions made by the executive branch of government, not a function of the Plan.

Seventh, defendant says he would use an evidentiary hearing to "establish that actual voter records are utilized only in states that do not maintain registered voter lists, and that there is a trend nationally to use multiple course lists." This evidence, while it might be of interest in connection with possible amendments to the Plan, is simply not material to any issue in defendant's criminal prosecution.

An additional topic, or at least a new twist on one of the original seven topics, appeared in defendant's Response to Court's Orders of April 6, 1994. There, defendant's counsel explained that she entertains some doubts about the accuracy of the jury clerk's records because she believes that some persons summoned who do not attend and are marked "absent" are released at the end of the term of service and some others may be reinserted into the jury wheel as if they had not been summoned. Defense counsel also found one panel for which no absences were marked causing her to note that she finds this "difficult to accept as the actual occurrence. Different clerks may have been engaged in the recording process." [47] Counsel also complains that on occasion an absent person may have been marked as an excused person and *vice-versa.* While such errors (and perhaps others) might have occurred in the process of summoning the more than sixty jury panels investigated by defendant, it would be pointless to interrogate various deputy clerks searching for administrative mistakes that may have been made from time to time. That such errors occasionally occur is inevitable, but reflects only some of the unavoidable "play" in the jury selection system. *See Hamling,* 418 U.S. at 137–38, 94 S.Ct. at 2917–18.

### E. Renewed Motion To Disqualify.

Defendant has previously asked this court to disqualify himself as well as every other judge of this district from passing on defendant's challenge to the Plan. It is unnecessary to repeat the earlier order denying the motion. In renewing his motion, defendant again relies upon 28 U.S.C. § 455(a) which provides that a judge should disqualify himself or herself in any proceeding in which the judge's "impartiality might reasonably be questioned." Defendant advances two new arguments to establish the proposition that the court's impartiality may reasonably be questioned. First, he asserts that the court's order sealing proceedings relating to the jury challenge gives rise to a reasonable question about the court's impartiality.[48] Second, he

---

**46.** As explained in section B.2.c. above, defendant did not apply his "statistical significance" method to the issue before the court and his "absolute impact" method is the functional equivalent of the "absolute disparity" method.

**47.** Defendant's Response to Court's Order of April 6, 1994, p. 4, at Docket No. 127 in *Kalyan* and Docket No. 210 in *Pleier.*

**48.** The order is at Docket No. 70 in *Kalyan* and Docket No. 152 in *Pleier.*

says that the court's denial of the motion by the Alaska Native Justice Center to file an *amicus curiae* brief shows that this court's impartiality may reasonably be questioned.[49]

■ Sealing the records relating to the jury selection issues cannot logically demonstrate partiality toward one party or another, so defendant asserts that it can be connected up to the applicable statutory standard because the order shows that "the court does not want the public to know about the systematic underrepresentation alleged by the defendants...."[50] A more obvious purpose for the sealing of the records is protecting the privacy of jurors. Were it reasonable to believe that the purpose was to deny knowledge to the public (and thereby to evidence partiality), there could be no accounting for the fact that the order sealing all records referencing jury selection issues was vacated promptly when it was questioned by defendant.[51] The court's concern to protect juror privacy is clearly articulated in the order unsealing the records which reads as follows:

> The motion at docket 173 to unseal pleadings is GRANTED. The order at docket 152 is vacated as improvidently entered. The clerk shall unseal all pleadings sealed as a result of that order. The parties are reminded that the provisions of the court's order at docket 145 remain in force, *because the court remains concerned to protect the privacy of individual jurors and prospective jurors to the maximum extent consistent with the needs of the parties to present their arguments.* (Emphasis added.)[52]

In sum, entry of the order was an error, but one founded upon a concern to protect the privacy of persons who give of their time to serve on juries. Concern for protection of the privacy of jurors is not an untoward or improper consideration and cannot reasonably be said to evidence a lack of impartiality. *See* 28 U.S.C. § 1867(f); *cf.,* Fed. R.Crim.P. 6(d) and (e).

■ Second, defendant contends that the court's decision not to allow the Alaska Native Justice Center to file an *amicus curiae* brief may reasonably be seen as evidence of partiality, "because the court does not care to hear about the impact of that underrepresentation from a class of people who are effected."[53] Defendant simply assumes the existence of an implausible motive as well as a conclusion not established in the record regarding the representative stature of an entity which styles itself the "Alaska Native Justice Center." The frailty of defendant's contention is exposed by his willingness to misrepresent plaintiff's position on the *amicus curiae* brief. Defendant argues that the court denied the request by the Alaska Native Justice Center *"even though no party opposed that participation."* (Emphasis in original.)[54] Yet, as an examination of the record shows, the government did oppose the acceptance of the brief.[55] Moreover, before ruling on the motion, the court specifically asked *both* parties to comment on the request from the stranger to the action.[56] It cannot reasonably be said that a decision finding that an *amicus curiae* brief as to which a party objects and which the court finds to be unnecessary shows a lack of impartiality. *Cf.,* Rule 29, Federal Rules of Appellate Procedure.

The renewed motion for disqualification also seeks disclosure of all contacts between the court and the other judges of the district and employees of the clerk of court regarding the factual assertions made by defendant.

**49.** The order is at Docket No. 99 in *Kalyan* and at Docket No. 188 in *Pleier.*

**50.** Renewed Motion For Disqualification And Motion For Disclosure, Docket No. 119 in *Kalyan* and Docket No. 203 in *Pleier* ("Renewed Motion") at p. 3.

**51.** The order vacating the sealing order appears at Docket No. 91 in *Kalyan* and Docket No. 181 in *Pleier.*

**52.** The quoted order is from *Pleier.* The order in *Kalyan* is identical, except that the docket numbers to which reference is made are different.

**53.** Renewed Motion at p. 3.

**54.** Renewed Motion at p. 3.

**55.** The government's seven-page opposition is found at Docket No. 97 in *Kalyan* case and at Docket No. 185 in *Pleier.*

**56.** Docket No. 92 in *Kalyan* and Docket No. 180 in *Pleier.*

To support this request, defendant asserts that the court is relying on personal knowledge of evidentiary facts material to the proceeding. An examination of the court's opinion set out above shows that the court has not relied upon any personal knowledge of facts. Rather, in all instances, the court has either accepted what the defendant offered as correct, or explained why the facts or argument offered by defendant were not properly cognizable under the law. While the court has taken judicial notice of certain adjudicative facts, this is expressly permitted by Fed.R.Evid. 201, and in all cases the parties were afforded an opportunity to be heard.[57] Taking judicial notice is, of course, not the same thing as relying on personal knowledge of the facts. In short, there is nothing to disclose.

### F. *Renewed Request To File Amicus Curiae Brief.*

As explained in the ruling on the original motion, the court is confident that defendant is adequately represented by his counsel, the Federal Defender for the district. The court has examined the proposed *amicus curiae* brief and sees nothing in it which would assist in the determination of the issues presented by defendant. The renewed request appears to be premised on the erroneous assumption that the court will somehow base its decision on an interpretation of the Alaska Native Claims Settlement Act ("ANCSA"), concerning which defendant's counsel professes ignorance. The court's decision is not based upon an interpretation of ANCSA, and there is no reason to reconsider the original decision.

### CONCLUSION

For the reasons set forth above, the motions at Docket Nos. 76, 118, and 119 in Mr. Kalyan's case and the motions at Docket Nos. 166, 203 and 204 in Mr. Pleier's case are each DENIED. Trial shall proceed.

**57.** Defendant did not object to the truth of any such facts but did indicate doubt as to the relevance of some. *See* Docket Nos. 109, 116, and 126 at pp. 10, 131, 134, and 136 in *Kalyan;* Docket Nos. 196, 206, 209 at p. 10, 214, 216, and 218 in *Pleier. See also* footnote 25 above.