USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________
 
No. 98-1825
 
 UNITED STATES OF AMERICA,
 
 Appellee,
 
 v.
 
 JEROME E. ROYAL,
 
 Defendant, Appellant.
 
 ____________________
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Robert E. Keeton, U.S. District Judge]
 
 ____________________
 
 Before
 
 Selya, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 ____________________
 
 
 James E. Carroll, with whom Sheila High King and Cetrulo &
Capone LLP were on brief, for appellant.
 Nadine Pellegrini, Assistant U.S. Attorney, with whom Donald
K. Stern, U.S. Attorney, was on brief, for appellee. 
 
 ____________________
 
 April 2, 1999
 ____________________
 
 
 LYNCH, Circuit Judge. After prevailing, in a previous
appeal to this court, on his motion to inspect the jury selection
records of the Eastern Division of the District of Massachusetts,
Jerome E. Royal moved for a new trial, claiming that the selection
process used to pick the jury panel that convicted him of
conspiracy and mail fraud violated the Sixth Amendment and the Jury
Selection and Service Act ("the Act"). The district court denied
this motion. Royal appeals, urging that the selection process
produces systematic underrepresentation of blacks, an argument
which depends upon changing the law of this Circuit governing
evaluation of a jury selection challenge. We decline the
invitation and affirm.
 I
 The facts relating to Royal's conviction and first appeal
are set forth in United States v. Royal, 100 F.3d 1019 (1st Cir.
1996), and we recount only the most relevant aspects here.
 Royal was indicted in 1992 on charges of mail fraud,
conspiracy to commit mail fraud, and aiding and abetting. See id.
at 1023. When the case was called for trial, Royal made various
motions relating to the jury venire and the jury selection process
for the Eastern Division. The district court denied Royal's
motions to inspect the jury records of the Eastern Division,
suggesting "that, in order to inspect the requested records, Royal
was required to make a showing that he would be able to satisfy the
three prongs of [the test for establishing a prima facie violation
of the fair cross-section requirement]." Id. at 1024. The case
proceeded to trial; the jury found Royal guilty of one count of
conspiracy and eight counts of mail fraud. See id. at 1023.
 Royal appealed. This court rejected Royal's challenges
to the jury charge, the sufficiency of the evidence, and various
aspects of his sentence, but reversed the district court's denial
of his motions to inspect the jury records and remanded for further
proceedings. See id. at 1022. Relying on 28 U.S.C. 1867(f) and
Test v. United States, 420 U.S. 28 (1975), this court stated that
"a defendant, such as Royal, challenging the jury selection
procedures has an unqualified right to inspect jury records. . . .
[A] district court may not premise the grant or denial of a motion
to inspect upon a showing of probable success on the merits of a
challenge to the jury selection provisions." Royal, 100 F.3d at
1025. The court therefore "remand[ed] the case with instructions
to allow Royal access to [the jury records] . . . in order to
support a motion to strike the jury venire" and authorized Royal to
"move for a new trial under 28 U.S.C. 1867(a)." Id. at 1025-26. 
 Upon remand to the district court, the district judge
made provisions for permitting Royal to inspect "[t]he contents of
records or papers used by the jury commission or clerk in
connection with the jury selection process" for 1994, the year
relevant to Royal's particular jury. 28 U.S.C. 1867(f), quoted
in Royal, 100 F.3d at 1025-26. These provisions included a
substantial time period for Royal to examine and evaluate the
materials as well as the grant of Royal's motions for appointment
and compensation of an expert. Eventually, on December 24, 1997,
Royal moved for a new trial, claiming that he "was denied his Sixth
Amendment right under the United States Constitution and his
statutory right under the Jury Selection and Service Act, 28 U.S.C.
 1861 et seq., to a jury selected at random from a fair cross
section of the community." United States v. Royal, 7 F. Supp. 2d
96, 97-98 (D. Mass. 1998) (internal quotation marks omitted).
 Royal's claim of constitutional and statutory flaws in
the selection process was based on the operation and implementation
of the Amended Jury Plan for the District of Massachusetts, which
is dated September 6, 1989. See generally 28 U.S.C. 1863(a)
("Each United States district court shall devise and place into
operation a written plan for random selection of grand and petit
jurors that shall be designed to achieve the objectives of . . .
and that shall otherwise comply with . . . this title."). This
Plan divides the district into three divisions for jury selection
purposes, one of which is the Eastern Division at issue in this
case (consisting of Barnstable, Bristol, Dukes, Essex, Middlesex,
Nantucket, Norfolk, Plymouth, and Suffolk counties). The source
for selection of jurors in each division is "the numbered local
resident lists submitted annually to the Office of the Jury
Commissioner for the Commonwealth of Massachusetts in accordance
with Massachusetts General Laws Chapter 234A," which the Plan
states "includes all registered voters, supplemented by all
residents not registered to vote." Names are randomly selected
from the resident lists and placed in the Master Jury Wheel. At
this stage, the Plan provides for a one-step summoning and
qualification process, as authorized by the Act, see 28 U.S.C.
 1878, and specifies various categories of potential jurors who
are unqualified, exempt, and eligible for excuse, in accordance
with 28 U.S.C. 1863, 1865, and 1866. The Plan also, inter alia:
 (1) requires the Jury Clerk to note the "determination"
whether a prospective juror is unqualified, exempt, or excused "in
the space provided on the juror qualification form,"
 (2) permits the Clerk to "grant temporary excuses to
prospective jurors on the grounds of undue hardship or extreme
inconvenience,"
 (3) mandates that temporarily excused jurors be resummoned
"at the conclusion of the excuse period," and
 (4) provides that "[t]he Court will, from time to time,
review the actions of the Clerk [in granting such temporary
excuses] . . . to determine whether or not there is an abuse of the
discretion granted to the Clerk."
 Upon inspection of the 1994 records, Royal concluded that
21,900 prospective jurors were summoned, that 18,451 returned their
juror qualification forms, and that 415 of the forms were returned
by individuals identifying themselves as black and 1,185 were
returned by individuals who declined to designate their race. The
difference between 18,451 and 21,900 is accounted for by the fact
that 899 summonses were nondeliverable and 2,550 were not returned
by the recipients.
 Of the 415 identifiable black prospective jurors who
returned qualification forms, Royal discovered, 41 were
disqualified and 13 were exempt from service. One hundred and four
of the remaining black prospective jurors were excused at some
point during the selection process; 10 of those excuses were
granted without notation of a request or a reason for the excuse in
the records examined.
 At juror orientation, Royal found, some 5,571 prospective
jurors appeared, of whom 167 were black. Royal determined that 24
prospective black jurors were labeled no-shows and 66 did not
appear because their panels were cancelled due to lack of
necessity. 
 To help explain these numbers, Royal had an expert
analyze the data. Royal's expert analyzed the zip codes of the
nondeliverable and nonreturned summonses and concluded that
summonses failed more often in areas in which the size of the black
population is relatively significant. For instance, the expert
concluded that summonses failed twice as often in areas in which
more than 50% of the population is black than they did in areas in
which blacks make up less than 2% of the population. The expert
also concluded that the Massachusetts resident lists were flawed
and undercounted black residents.
 On June 12, 1998, the district court denied Royal's
motion for a new trial. See Royal, 7 F. Supp. 2d at 106-07. The
court found Royal's calculation of black underrepresentation faulty
because, inter alia, that calculation compared the number of self-
identified blacks who returned questionnaires with the total number
of individuals (of whatever race) summoned rather than merely with
the total number who returned questionnaires. See id. at 105. At
any rate, the court concluded, Royal's new trial motion failed,
even assuming his calculation was correct, because the levels of
disparity that Royal had identified were not objectionable under
either the Sixth Amendment or the Act. See id. at 106.
 The court also rejected the arguments that the
Massachusetts resident lists used as a source for selecting jurors
were insufficient because they undercounted blacks, that the
alleged failure to account for undeliverable or nonreturned
responses violated the Act, and that the Jury Clerk committed a
material abuse of discretion by failing to list a reason for
excusing ten black prospective jurors. See id. at 101-03.
 Royal appeals the district court's denial. We review the
district court's findings of fact for clear error and its
conclusions of law de novo. See United States v. Paniagua-Ramos,
135 F.3d 193, 197 (1st Cir. 1998); Royal, 100 F.3d at 1023-24;
United States v. Shinault, 147 F.3d 1266, 1271 (10th Cir.), cert.
denied, 119 S. Ct. 459 (1998). In the end, any dispute over the
facts is essentially moot. This case turns on the choice of
statistical methodology to determine whether there is
underrepresentation of black persons.

 II
 "[T]he American concept of the jury trial contemplates a
jury drawn from a fair cross section of the community," Taylor v.
Louisiana, 419 U.S. 522, 527 (1975), and "the fair-cross-section
requirement [is] fundamental to the jury trial guaranteed by the
Sixth Amendment," id. at 530; see also Holland v. Illinois, 493
U.S. 474, 480 (1990). The Sixth Amendment provides: "In all
criminal prosecutions, the accused shall enjoy the right to a . .
. trial[] by an impartial jury of the State and district wherein
the crime shall have been committed . . . ." U.S. Const. amend.
VI; see also 28 U.S.C. 1861 ("It is the policy of the United
States that all litigants in Federal courts entitled to trial by
jury shall have the right to grand and petit juries selected at
random from a fair cross section of the community in the district
or division wherein the court convenes.").
 This requirement of a fair cross-section, however, does
not guarantee that juries be "of any particular composition,"
Taylor, 419 U.S. at 538, or that "venires . . . [be] a
substantially true mirror of the community," Barber v. Ponte, 772
F.2d 982, 997 (1st Cir. 1985) (en banc). All that is required is
that "the jury wheels, pools of names, panels, or venires from
which juries are drawn must not systematically exclude distinctive
groups in the community and thereby fail to be reasonably
representative thereof." Taylor, 419 U.S. at 538.
 In order to make a prima facie case of a violation of the
fair cross-section requirement, a defendant must show:
 (1) that the group alleged to be excluded is a "distinctive"
 group in the community; (2) that the representation of this
 group in venires from which juries are selected is not fair
 and reasonable in relation to the number of such persons in
 the community; and (3) that this underrepresentation is due to
 systematic exclusion of the group in the jury-selection
 process. 

Duren v. Missouri, 439 U.S. 357, 364 (1979), quoted in United
States v. Hafen, 726 F.2d 21, 23 (1st Cir. 1984); see also United
States v. Foxworth, 599 F.2d 1, 3-4 (1st Cir. 1979). This test
applies to Royal's fair cross-section claims under both the Sixth
Amendment and the Act. See, e.g., Shinault, 147 F.3d at 1270-71;
Hafen, 726 F.2d at 23 n.1.
 There is no dispute that Royal has satisfied the first
prong of this test; blacks are unquestionably a "distinctive" group
for the purposes of a fair cross-section analysis. See Hafen, 726
F.2d at 23 (citing Peters v. Kiff, 407 U.S. 493, 498-99 (1972)). 
 With respect to the second prong, courts and commentators
have discussed various forms of statistical analysis that may be
used to demonstrate that representation is not "fair and reasonable
in relation to the number of such persons in the community." See,
e.g., Peter A. Detre, Note, A Proposal for Measuring
Underrepresentation in the Composition of the Jury Wheel, 103 Yale
L.J. 1913, 1917-18 (1994). Only two of these forms -- "absolute
disparity" and "comparative disparity" -- are at issue in this
case. Absolute disparity measures the difference between the
percentage of members of the distinctive group in the relevant
population and the percentage of group members on the jury wheel. 
See Hafen, 726 F.2d at 23 (calculating "the difference between the
percentage of eligible blacks in the population and the percentage
of blacks on the master wheel"); see also United States v. Pion, 25
F.3d 18, 23 n.5 (1st Cir. 1994) (defining the absolute disparity
standard as "the gross spread between the percentage of eligible
Hispanics . . . in the relevant population and the percentage of
Hispanic representation on the Master Jury Wheel"); cf. United
States v. Rioux, 930 F. Supp. 1558, 1565-68 (D. Conn. 1995)
(stating that "[t]he identified systematic defect defines . . . the
particular pool"), aff'd, 97 F.3d 648 (2d Cir. 1996).
 In contrast, comparative disparity "measures the
diminished likelihood that members of an underrepresented group,
when compared to the population as a whole, will be called for jury
service." Ramseur v. Beyer, 983 F.2d 1215, 1231-32 (3d Cir. 1992). 
It is calculated by dividing the absolute disparity percentage by
the percentage of the group in the population. See Hafen, 726 F.2d
at 23 (stating that comparative disparity is measured by
calculating "the percentage difference between the proportion of
blacks eligible to serve as jurors . . . and the shortfall in black
representation"); see also Pion, 25 F.3d at 23 n.5.
 For fifteen years, this Circuit has rejected comparative
disparity analysis and applied absolute disparity analysis in cases
similar to the case at hand, and we have recently reaffirmed this
position. In United States v. Hafen, 726 F.2d 21 (1st Cir. 1984),
in which this court upheld a previous version of the selection plan
for the Eastern Division, the court assumed that, as Hafen
contended, 3.73% of the Eastern Division's over-eighteen population
was black and only 1.714% of the master jury wheel was black. See
id. at 23. The court concluded, however, that the resulting 2.02%
absolute disparity was "insufficient to show underrepresentation,"
citing cases from other circuits that accepted absolute disparities
of up to 10%. Id. The court recognized that the absolute
disparity in the case would be small "even if every black in the
region were excluded from jury service," and "acknowledge[d] the
possibility that the comparative disparity calculation might be a
useful supplement to the absolute disparity calculation in some
circumstances." Id. at 23-24. However, Hafen refused to employ a
comparative disparity calculation, explaining that such a
calculation "distorts reality" in situations in which "a very small
proportion of the population is black." Id. at 24 (quoting United
States v. Whitley, 491 F.2d 1248, 1249 (8th Cir. 1974)) (internal
quotation marks omitted); see also id. ("[T]he smaller the group
is, the more the comparative disparity figure distorts the
proportional representation."). Hafen distinguished LaRoche v.
Perrin, 718 F.2d 500 (1st Cir. 1983), which did use a comparative
calculation, because that case "did not adopt the comparative
disparity analysis to deal with . . . the situation in which the
group allegedly underrepresented forms a very small proportion of
the total population." Id. at 24 n.3. Finally, the court also
noted an additional reason why the comparative disparity
calculation was inappropriate: "A small variation in the figures
used to calculate comparative disparity can produce a significant
difference in the result, and the appellees have demonstrated that
there is reason to doubt the accuracy of the figures on which
appellant would have us rely." Id. at 24.
 Hafen's rejection of comparative disparity was reaffirmed
in United States v. Pion, 25 F.3d 18 (1st Cir. 1994), which also
involved the Eastern Division's Plan. Pion argued that his Sixth
Amendment rights were violated because, although 4.2% of the
Eastern Division's residents were Hispanic, "only 0.99% of all
persons responding to the juror questionnaire during 1992, and
0.80% of those appearing for juror orientation, were Hispanic." 
Id. at 22. The court found that Pion failed to establish
"systematic exclusion," the third prong of the Duren test, since
"there can be no reasonable inference that the relatively small
Hispanic underrepresentation at jury orientation is attributable to
anything other than the randomness of the draw from either the
resident lists or the Master Jury Wheel." Id. at 22-24. Although
the court did not rely on the second prong of the Duren test in
rejecting Pion's claim, it rested its conclusion that the
underrepresentation was "relatively small," id. at 24; see also id.
at 24 n.7, on what Pion calculated was a 3.4% absolute disparity
between the "Hispanic representation in the relevant general
population" and the "Hispanic representation among persons
appearing for juror orientation," id. at 23. The court made a
point of citing Hafen's reasons for rejecting a comparative
disparity calculation where the underrepresented group is small or
where the accuracy of the relevant figures is in doubt. See id. at
23 & n.5 (stating that Pion's figures, which produced a comparative
disparity of 81%, were not accurate). The vitality of Pion has
recently been reaffirmed. See United States v. Rodriguez, 162 F.3d
135, 148 (1st Cir. 1998); United States v. Lopez, 147 F.3d 1, 2
(1st Cir. 1998).
 This court's choice of absolute disparity over
comparative disparity in these cases is in keeping with the choices
made by many of our sister circuits. See generally Detre, supra,
at 1919-20 ("While not explicitly endorsing any of the mathematical
tests, the [Duren] Court seems to have considered only absolute
disparity. . . . The majority of courts have looked to absolute
disparity or . . . [a similar] standard[] to determine whether
underrepresentation of a group is substantial for purposes of the
fair cross-section guarantee."). At least six circuits have
endorsed the absolute disparity or closely related "absolute
impact" method of calculating underrepresentation (although some
have also noted that even were comparative disparity used, the
number presented would not be enough to demonstrate a problem with
the jury selection process at issue). See United States v.
Shinault, 147 F.3d 1266, 1272-73 (10th Cir.) (stating that "[i]n
this circuit, absolute disparity . . . is the starting place for
all other modes of comparison," noting the flaws in both disparity
approaches, and concluding that neither the absolute nor the
comparative disparities calculated demonstrate a constitutional or
statutory violation (internal quotation marks omitted)), cert.
denied, 119 S. Ct. 459 (1998); United States v. Rioux, 97 F.3d 648,
655-56 (2d Cir. 1996) ("Although we have admittedly waffled on this
issue in the past, the law in this Circuit strongly suggests the
absolute disparity/absolute numbers approach is appropriate in this
case."); United States v. Ashley, 54 F.3d 311, 313-14 (7th Cir.
1995) (applying absolute disparity); United States v. Sanchez-
Lopez, 879 F.2d 541, 547 (9th Cir. 1989) ("[W]e have consistently
favored an absolute disparity analysis and have rejected a
comparative disparity analysis."), quoted in Thomas v. Borg, 159
F.3d 1147, 1150 (9th Cir. 1998); Ford v. Seabold, 841 F.2d 677,
683-84 (6th Cir. 1988) (conducting an absolute disparity analysis
but relying on the third Duren prong to reject the fair cross-
section claim); United States v. Clifford, 640 F.2d 150, 155-56
(8th Cir. 1981) ("This court has not seen fit to adopt the
comparative disparity concept as a better means of calculating
underrepresentation."), cited in United States v. Rogers, 73 F.3d
774, 775-77 (8th Cir. 1996) (acknowledging that the panel is bound
by circuit precedent, but arguing that comparative disparity is
superior for dealing with small distinctive groups).
 A few circuits have either not chosen between the two
methodologies or have taken different approaches. See United
States v. Lewis, 10 F.3d 1086, 1090 (4th Cir. 1993) ("[I]n order to
be fair and reasonable, the disparity between the proportion of
eligible whites selected for [the] master jury wheel and [the]
proportion of eligible minority persons selected must not exceed
twenty percent." (internal quotation marks omitted)); Ramseur, 983
F.2d at 1231-35 (considering comparative disparity and absolute
disparity, without favoring one over the other, in the course of
resolving equal protection and Sixth Amendment challenges).
 Many of the courts that have endorsed an absolute
disparity or absolute impact test have also echoed the Hafen
court's criticisms of the comparative disparity measure. See,
e.g., Thomas, 159 F.3d at 1150 ("[T]he comparative disparity test
is strongly disfavored in the Ninth Circuit on the ground that it
exaggerates the effect of any deviation."); United States v. Pepe,
747 F.2d 632, 649 n.18 (11th Cir. 1984); cf. Smith v. Yeager, 465
F.2d 272, 279 n.18 (3d Cir. 1972) ("[T]he comparative approach
reaches absurd results in [a case in which] . . . the [black]
population at the time was 4.4% of the total, and [black] jury
participation ranged as low as 2% of the jury list").
 Royal acknowledges that the absolute disparity standard
is the "existing standard used in this Circuit," and does not make
a serious attempt to distinguish Hafen and Pion from the case at
hand, but urges this court to "change" the standard, noting that
"[t]he absolute disparity standard . . . can have the harsh effect
of sanctioning the total exclusion of members of a minority group
within the community when that group's percentage of the
composition of the population is very low." Appellant's Brief at
21. However, "[i]t is axiomatic that, '[i]n a multipanel circuit,
newly constituted panels are, for the most part, bound by prior
panel decisions closely on point.' This principle applies in
criminal as well as civil cases." United States v. Graciani, 61
F.3d 70, 75 (1st Cir. 1995) (citation omitted) (quoting Williams v.
Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)). 
 There are two exceptions to this stare decisis rule: (1)
"[a]n existing panel decision may be undermined by controlling
authority, subsequently announced, such as an opinion of the
Supreme Court, an en banc opinion of the circuit court, or a
statutory overruling"; and (2) "authority that postdates the
original decision, although not directly controlling, [may]
nevertheless offer[] a sound reason for believing that the former
panel, in light of fresh developments, would change its collective
mind." Williams, 45 F.3d at 592; see also Irving v. United States,
162 F.3d 154, 160 (1st Cir. 1998) (en banc). Royal does not
expressly invoke either of these exceptions, and, in any event,
neither of them is applicable. To the extent that the absolute
disparity mode of analysis is open to criticism on statistical or
logical grounds, see, e.g., United States v. Jackman, 46 F.3d 1240,
1247 (2d Cir. 1995) (noting that absolute disparity ignores the
size of the allegedly underrepresented group); United States v.
Levasseur, 704 F. Supp. 1158, 1163 & n.7 (D. Mass. 1989) (same),
this criticism is not by any means a "fresh development." Indeed,
the Hafen court directly acknowledged that complete exclusion of a
small distinctive group will result in only a small absolute
disparity, and nevertheless chose to apply the absolute disparity
test to the case before it. See Hafen, 726 F.2d at 23-24.
 We accordingly employ the absolute disparity test to
assess Royal's fair cross-section claim under the second prong of
the test under the Sixth Amendment and the Act. Royal argues that
"[a]lthough Blacks constitute 4.86% of the 1990 United States
Census count for the total population of all persons 18 years and
over in the . . . Eastern Division, they comprise only 1.89% of the
prospective jurors on the [1994] Master Jury Wheel, . . . only 2.2%
of all prospective jurors" who were not deemed exempt,
disqualified, or excused, and "only 2.9% of the jurors who appeared
for jury orientation." Appellant's Brief at 35. Of these
percentages, the 1.89% figure yields the highest absolute
disparity: 2.97% (4.86%, Royal's baseline population figure, minus
1.89%). Even assuming arguendo that Royal's numbers and
calculations are all correct and that he has provided the
appropriate numbers to plug into an absolute disparity
calculation, we conclude that the absolute disparity of 2.97% is,
given the circumstances of this case, not meaningfully
distinguishable from the 2.02% absolute disparity accepted in
Hafen. It is therefore insufficient to satisfy Royal's burden
under the second prong of Duren. See Hafen, 726 F.2d at 23-24;
cf., e.g., Shinault, 147 F.3d at 1272-73 (accepting an absolute
disparity of 2.56% and comparative disparity of 50.09% for blacks,
who were 5.11% of the voting age population); United States v.
Suttiswad, 696 F.2d 645, 648-49 (9th Cir. 1982) (accepting an
absolute disparity of 2.8% for blacks, who were 9.3% of the
population; an absolute disparity of 7.7% for "Spanish" persons,
who were 11.9% of the population; and an absolute disparity of 4.7%
for Asians, who were 8.3% of the population). Because we decide
this case under Duren's second prong -- fair and reasonable
representation -- we do not reach the issue of systematic exclusion
under Duren's third prong. See Hafen, 726 F.2d at 24.
 Royal argues that the Massachusetts resident lists do not
include an adequate number of blacks, that the selection process
fails to provide for follow up on nondeliverable and nonreturned
qualification forms even though a disproportionate number of such
forms are traceable to areas with significant black populations,
and that ten black prospective jurors were excused without a reason
recorded. Although such arguments have been briefed under the
"systematic exclusion" rubric, an appellation that adds nothing to
those arguments given our holding, we nevertheless briefly consider
whether Royal has identified a "substantial failure to comply with"
any provision of the Act besides the fair cross-section
requirement. 28 U.S.C. 1867(a). "A substantial failure is one
that contravenes one of . . . two basic principles . . . : (1)
random selection of jurors, and (2) determination of juror
disqualification, excuses, exemptions, and exclusions on the basis
of objective criteria. Technical violations, or even a number of
them, that do not frustrate the[se] . . . requirements and do not
result in discrimination and arbitrariness do not constitute a
substantial failure to comply." United States v. Savides, 787 F.2d
751, 754 (1st Cir. 1986); see also United States v. Ramirez, 884
F.2d 1524, 1530 (1st Cir. 1989) ("The test . . . for a substantial
violation is whether it 'either allowed discriminatory selection of
jurors or otherwise prevented jury panels from consisting of fair
cross sections of the community.'" (quoting United States v.
Bearden, 659 F.2d 590, 602 (5th Cir. Unit B Oct. 1981))); H.R. Rep.
No. 90-1076 (1968), reprinted in 1968 U.S.C.C.A.N. 1792, 1793-94.
 The use of the resident lists cannot be such a
substantial failure to comply with the Act; Congress specifically
endorsed the use of resident lists for Massachusetts. See 28
U.S.C. 1863(b)(2) ("The plan for the district of Massachusetts
may require the names of prospective jurors to be selected from the
resident list provided for in chapter 234A, Massachusetts General
Laws, or comparable authority, rather than from voter lists."). 
The failure to follow up on the qualification forms, enclosed with
summonses, that are not completed and returned does not constitute
a substantial violation of the Act in this case, where no fair
cross-section violation has been established. See 28 U.S.C.
 1864, 1866; United States v. Gometz, 730 F.2d 475, 479-82 (7th
Cir. 1984) (en banc); United States v. Santos, 588 F.2d 1300, 1303
(9th Cir. 1979).
 More troubling is the excusing of ten black prospective
jurors without a recorded reason. However, there is nothing to
suggest that subjective criteria were used to excuse these jurors
(for instance, Royal has provided no data on the number of nonblack
jurors who were excused without a recorded reason), see 28 U.S.C.
 1862 ("No citizen shall be excluded from service as a grand or
petit juror in the district courts of the United States . . . on
account of race, color, religion, sex, national origin, or economic
status."), and the "opportunity to err" that exists here is not
enough to establish a substantial failure to comply with the Act. 
Savides, 787 F.2d at 754-55 (excusing the court's error in using "a
commercial mailing firm to select the names of potential jurors"
and stating that "a mere opportunity to err or discriminate in the
jury selection process [does not] constitute[] a substantial
failure to comply with the policy and purposes of the Act"); cf.
United States v. Gregory, 730 F.2d 692, 700 (11th Cir. 1984);
United States v. Bearden, 659 F.2d 590, 607-08 (5th Cir. Unit B
Oct. 1981); United States v. Pleier, 849 F. Supp. 1321, 1333 (D.
Alaska 1994) (noting that some recording errors involving the
marking of jurors as "absent" may have occurred, but concluding
that these errors "reflect[] only some of the unavoidable 'play' in
the jury selection system" (quoting Hamling v. United States, 418
U.S. 87, 138 (1974))). But see United States v. Calabrese, 942
F.2d 218, 229 (3d Cir. 1991). Although the number of prospective
black jurors was admittedly small, the recording errors were
nevertheless "too few in number, too insignificant, too desultory,
to constitute a substantial violation of the Act." United States
v. Marrapese, 610 F. Supp. 991, 1001 (D.R.I. 1985); see also United
States v. Candelaria-Silva, 166 F.3d 19, 33 (1st Cir. 1999). This
is so even though excusing these ten jurors was apparently done by
the clerk rather than by a district court judge. See 28 U.S.C.
 1866(c); Ramirez, 884 F.2d at 1530 & n.6.
 III
 Royal has argued that he is entitled to a new trial
because his jury was selected through a process that did not
produce a fair cross-section as is guaranteed by the Sixth
Amendment and the Act. We have found that he is not entitled to a
new trial because he established no such violation. There is a
difference between what violates the law and what, while not in
violation, is still a situation leaving much to be desired. The
statistics presented -- that in 1994 fewer than 200 persons who
identified themselves as black actually presented for jury duty,
out of more than 5000 prospective jurors appearing in the Eastern
Division -- are disquieting.
 The District of Massachusetts may wish to consider
whether taking additional steps that are responsive to the issues
that Royal has identified, such as sending follow-up postcards to
prospective jurors who do not return their qualification forms,
would serve the goals of "assurance of a diffused impartiality,"
encouragement of "public confidence in the fairness of the criminal
justice system," and "civil responsibility." Taylor, 419 U.S. at
530-31 (internal quotation marks omitted); see also Anaya v.
Hansen, 781 F.2d 1, 7 (1st Cir. 1986) ("[T]here is a difference
between the optimal results which particularly well-administered
jury plans . . . can achieve, and the minimum which the
Constitution requires."); United States v. Reyes, 934 F. Supp. 553,
566 (S.D.N.Y. 1996) ("[A] finding that the above disparities are
not unconstitutional is not the same as an endorsement of such
discrepancies."). We also note that careful recordkeeping,
including recording the reasons for disqualifications, exemptions,
and excusals, "constitutes an important means for checking on the
operation of the selection system." H.R. Rep. 90-1076, reprinted
in 1968 U.S.C.C.A.N. 1792; see also 28 U.S.C. 1865, 1866(d).
 Nevertheless, we have carefully considered all of Royal's
arguments, and find no constitutional or statutory infirmity that
would warrant a new trial. The district court's denial of Royal's
motion for a new trial is therefore affirmed.